**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| THOMAS O'BRIEN, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>THE VANGUARD GROUP, INC.,<br><br>Defendant. | Case No.:<br><br>**COMPLAINT – CLASS ACTION**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Thomas O'Brien ("Plaintiff"), individually and on behalf of all others similarly situated, by and through undersigned counsel, brings this Class Action Complaint against Defendant The Vanguard Group, Inc. ("Vanguard" or "Defendant"). Plaintiff seeks to obtain damages, restitution, and injunctive relief for the Class, as defined below, from Vanguard. Plaintiff makes the following allegations upon information and belief, except as to his own actions, the investigation of his counsel, and the facts that are a matter of public record.

## INTRODUCTION

1. This class action arises out of a data breach of Vanguard's systems, which Vanguard reported to the Vermont Attorney General on or around November 4, 2026, and which resulted from Vanguard's failure to secure and safeguard the sensitive Private Information that Plaintiff and Class Members entrusted to it, including their names and Social Security numbers.

2. Vanguard is a Pennsylvania-based investment management company and one of the largest asset managers in the world, offering mutual funds, exchange-traded funds, brokerage, retirement, and advisory services to tens of millions of investors.

3. As a condition of opening accounts and receiving financial services from Vanguard, Plaintiff and Class Members entrusted it with sensitive Private Information with the expectation that Vanguard would keep it secure and safe from bad actors.

4. However, Vanguard failed to do so. On or around November 4, 2026, Vanguard reported to the Vermont Attorney General that a data security incident had compromised the Private Information of Vermont residents, including their names and Social Security numbers (the "Data Breach" or "Breach"). Vanguard has not publicly disclosed when the Data Breach occurred, how it occurred, when Vanguard discovered it, or how many individuals were affected nationwide.

5. The Data Breach was a direct result of Vanguard's failure to implement adequate and reasonable cybersecurity procedures and protocols necessary to protect individuals' PII from the foreseeable threat of a cyberattack.

6. By taking possession and control of Plaintiff's and Class Members' Private Information for its own pecuniary benefit, Vanguard assumed a duty to Plaintiff and Class Members to implement and maintain reasonable and adequate security measures to secure, protect, and safeguard Plaintiff's and Class Members' Private Information against unauthorized access and disclosure. Vanguard also had a duty to adequately safeguard this Private Information under industry standards and duties imposed by statutes, including Section 5 of the Federal Trade Commission Act ("FTC Act").

7. Vanguard breached those duties by, among other things, failing to implement and maintain reasonable security procedures and practices to protect clients' and other individuals' Private Information from unauthorized access and disclosure.

8. The exposure of a person's PII through a data breach ensures that such person will be at a substantially increased and certainly impending risk of identity theft crimes compared to

the rest of the population, potentially for the rest of that person's life. As a result of the Data Breach, Plaintiff and Class Members are at imminent and substantial risk of experiencing various types of misuse of their Private Information in the coming years, including but not limited to, takeover of their financial and investment accounts, unauthorized access to email accounts, tax fraud, and identity theft.

9. Mitigating that risk, to the extent it is even possible to do so, requires individuals to devote significant time and money to closely monitor their credit, financial accounts, and email accounts, and take several additional prophylactic measures.

10. As a result of Vanguard's inadequate security and breach of its duties and obligations, the Data Breach occurred, and Plaintiff and Class Members suffered injury and ascertainable losses in the form of the loss of the benefit of their bargain, out-of-pocket expenses, loss of value of their time reasonably incurred to remedy or mitigate the effects of the attack, the diminution in value of their Private Information from its exposure, emotional distress, and the present and imminent risk of fraud and identity theft caused by the compromise of their sensitive Private Information. Plaintiff's and Class Members' sensitive Private Information—which was entrusted to Vanguard, its officials, and its agents—was compromised and unlawfully accessed due to the Data Breach.

11. Furthermore, Plaintiff's and Class Members' sensitive and confidential Private Information still remains in the possession of Vanguard. Absent additional safeguards and independent review and oversight, the information remains vulnerable to further cyberattacks and theft.

12. Vanguard disregarded the rights of Plaintiff and Class Members by, *inter alia*, failing to take adequate and reasonable measures to ensure its data systems were protected against

unauthorized intrusions; failing to disclose that it did not have adequately robust computer systems and security practices to safeguard PII of its clients and other individuals; failing to take standard and reasonably available steps to prevent the Data Breach; and failing to properly train its staff and employees on proper security measures.

13. Plaintiff brings this action individually and on behalf of individuals in the United States whose Private Information was exposed as a result of the Data Breach. Plaintiff and Class Members seek to hold Vanguard responsible for the harms resulting from the massive and preventable disclosure of such sensitive Private Information. Plaintiff seeks to remedy all of these harms resulting from the Data Breach on behalf of himself and all similarly situated individuals whose Private Information was accessed and, upon information and belief, exfiltrated during the Data Breach.

14. Plaintiff brings this action individually and on behalf of a class of similarly situated individuals against Defendant for: (i) negligence and negligence per se; (ii) breach of implied contract; (iii) unjust enrichment; (iv) violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law; and (v) declaratory judgment.

15. Plaintiff thus seeks remedies including, but not limited to, compensatory damages, punitive damages, treble damages, reimbursement of out-of-pocket costs, and declaratory and injunctive relief including improvements to Vanguard's data security systems, future annual audits, and adequate credit monitoring services funded by Vanguard.

## PARTIES

***Plaintiff Thomas O'Brien***

16. Plaintiff Thomas O'Brien is a citizen and resident of Lansdale, Pennsylvania.

17. Plaintiff O'Brien has been a Vanguard client since approximately 2017 and remains a Vanguard client today. Plaintiff O'Brien opens and accesses his Vanguard account online.

18. As a condition of opening his account and receiving financial services from Vanguard, Plaintiff O'Brien was required to provide, and did provide, his Private Information to Vanguard, including his name, address, date of birth, Social Security number, and financial information.

19. Plaintiff O'Brien takes care to protect his Private Information, including by using a passkey to secure access to his Vanguard account. Plaintiff O'Brien would not have entrusted his Private Information to Vanguard had he known that Vanguard would fail to adequately safeguard it.

20. Upon information and belief, Plaintiff O'Brien's Private Information was compromised in the Data Breach.

21. As a result of the Data Breach, Plaintiff O'Brien faces a substantial and imminent risk of fraud and identity theft, and he anticipates spending considerable time and effort monitoring his financial and investment accounts and credit for fraudulent activity.

***Defendant The Vanguard Group, Inc.***

22. Defendant The Vanguard Group, Inc. is a corporation organized under the laws of the Commonwealth of Pennsylvania and maintains its principal place of business at 100 Vanguard Boulevard, Malvern, Pennsylvania 19355.

## JURISDICTION AND VENUE

23. This Court has subject matter jurisdiction over this controversy pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because this is a class action in which the proposed

Class contains more than 100 members, the amount in controversy exceeds $5,000,000, exclusive of interest and costs, and at least one Class Member is a citizen of a state different from Defendant.

24. This Court has personal jurisdiction over Defendant because Defendant is incorporated in Pennsylvania, maintains its principal place of business in this District, and conducts substantial business in this District.

25. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) and (2) because Defendant resides in and is headquartered in this District, and, upon information and belief, a substantial part of the events or omissions giving rise to Plaintiff's claims, including Vanguard's decisions regarding the data security practices that led to the Data Breach, occurred in this District.

## FACTUAL ALLEGATIONS

### A. Vanguard's Business

26. Vanguard is one of the world's largest investment management companies. Founded in 1975 and headquartered in Malvern, Pennsylvania, Vanguard reported approximately $13.3 trillion in global assets under management as of July 31, 2026,[1] and serves more than 50 million investors worldwide.[2]

27. Vanguard touts a unique, client-owned corporate structure: The Vanguard Group, Inc. is owned by Vanguard's U.S.-domiciled funds, which are in turn owned by their investors.[3]

---

[1] *About Vanguard*, VANGUARD, https://www.nl.vanguard/professional/about-vanguard (last visited November 9, 2026).

[2] *Facts and Figures*, VANGUARD, https://corporate.vanguard.com/content/corporatesite/us/en/corp/why-vanguard/who-we-are/facts-and-figures.html (last visited November 9, 2026).

[3] *Why our ownership structure matters*, VANGUARD, https://corporate.vanguard.com/content/corporatesite/us/en/corp/why-vanguard/sets-us-apart/ownership.html (last visited November 9, 2026).

Vanguard thus holds itself out as an institution whose interests are aligned with those of its clients—the very people whose Private Information it failed to protect.

28. As a condition of opening an account and receiving financial services from Vanguard, Vanguard requires individuals to entrust it with sensitive Private Information. According to Vanguard's Online Privacy Notice, the information it collects includes "your name and address, Social Security or taxpayer identification number, date of birth," as well as information about clients' assets, income, account balances, investment activity, and accounts at other financial institutions.[4]

29. Plaintiff and Class Members provided their Private Information to Vanguard with the reasonable expectation that Vanguard would comply with its obligations, including statutory and common law obligations and normal industry standards, to keep such information secure, confidential, and safe from unauthorized access.

30. Vanguard also tells its personal investors that it collects their personal information when they, among other things, "[o]pen an account or deposit money," and that the information it collects includes "Social Security number and income," "[t]ransaction or loss history and account transactions," and "[a]ssets and investment experience."[5]

31. Vanguard further acknowledges that it collects information about its clients "from others, such as credit bureaus, affiliates, or other companies."[6]

---

[4] Online Privacy Notice, VANGUARD (last updated Sept. 2026), https://investor.vanguard.com/privacy-center/online-privacy-notice (last visited November 9, 2026).
[5] Personal Investor Privacy Notice, VANGUARD (rev. Sept. 2023), https://investor.vanguard.com/content/dam/retail/publicsite/en/documents/personal-investor-privacy-notice.pdf (last visited November 9, 2026).
[6] *Id.*

32. Vanguard made promises and representations to Plaintiff and Class Members that it would protect the Private Information it collects from them. Vanguard tells its clients that "[w]e're committed to maintaining the privacy and security of your personal information,"[7] and that "[t]o protect your personal information from unauthorized access and use, we use security measures that comply with federal law."[8] Vanguard's Online Privacy Notice further states:

> Within Vanguard, we restrict access to information about you to those Vanguard employees who need to know the information in order to perform their jobs, such as servicing your accounts, providing you with information you request, or notifying you of new products and services. To protect your personal information, we maintain physical, electronic, and procedural safeguards in keeping with industry standards and practices, and we review and adjust these safeguards regularly in response to advances in technology.[9]

However, despite these promises, Vanguard failed to maintain adequate security procedures to safeguard Plaintiff's and Class Members' Private Information.

33. Vanguard had a continuous duty to implement and maintain reasonable security measures to protect Plaintiff's and Class Members' Private Information—which it collected for its own financial benefit—from unauthorized disclosure to third parties, including cyber criminals.

**B. The Data Breach**

34. On or around November 4, 2026, Vanguard reported a data security incident to the Office of the Vermont Attorney General. According to the Vermont Attorney General's public security breach register, the Data Breach compromised the Social Security numbers of at least 94 Vermont residents.[10]

---

[7] Vanguard's Privacy Center, VANGUARD, https://investor.vanguard.com/privacy-center (last visited November 9, 2026).
[8] Personal Investor Privacy Notice, *supra*.
[9] Online Privacy Notice, *supra*.
[10] Security Breach Notices, OFF. OF THE VT. ATT'Y GEN., https://ago.vermont.gov/categories/security-breach-notices (last visited November 9, 2026).

35. Upon information and belief, the Private Information compromised in the Data Breach includes, at a minimum, Class Members' full names and Social Security numbers—the two pieces of information most essential to committing identity theft and financial fraud.

36. Vanguard's Vermont filing covers only Vermont residents. Because Vanguard is a national financial institution serving millions of investors across the United States, upon information and belief, the Data Breach affected Vanguard clients and other individuals throughout the country, and the total number of affected individuals is far greater than the number reported to Vermont.

37. To date, Vanguard has not publicly disclosed when the Data Breach occurred, when Vanguard discovered it, how the unauthorized actor gained access to its systems, how long the unauthorized actor had access, or what steps Vanguard has taken to ensure that a similar breach does not occur again.

38. This is not the first time Vanguard has reported that its clients' information was compromised. Vanguard has submitted data breach notifications to the Massachusetts Office of Consumer Affairs and Business Regulation on multiple occasions in recent years, including, upon information and belief, a February 11, 2026 notification involving Social Security numbers.[11]

39. In addition, throughout 2026, threat actors have publicly claimed to possess data stolen from Vanguard. In January 2026, a threat actor claimed to have accessed a dataset of 22.5 million records of Vanguard clients, including names, dates of birth, addresses, email addresses,

---

[11] *See, e.g.*, Data Breach Notification Nos. 2024-915, 2024-1888, & 2025-1344, MASS. OFF. OF CONSUMER AFFS. & BUS. REGUL., https://www.mass.gov/doc/assigned-data-breach-number-2024-915-the-vanguard-group-inc/download; https://www.mass.gov/doc/2024-1888-the-vanguard-group-inc/download; https://www.mass.gov/doc/2025-1344-the-vanguard-group-inc/download; https://www.mass.gov/doc/data-breach-report-2026/download (last visited November 9, 2026).

and phone numbers.[12] And in October 2026, a post on an underground forum advertised a database purportedly associated with investor.vanguard.com containing more than 14 million records, including logs of SMS verification codes that Vanguard sent to its clients.[13]

40. Due to Vanguard's negligent and wrongful conduct and the resulting acquisition of sensitive Private Information by unauthorized third parties, Plaintiff and Class Members now face a present, immediate, and ongoing risk that their information will appear on the dark web for access and abuse by all kinds of criminal actors.

41. In the very likely event that their information surfaces on the dark web, Plaintiff and Class Members are at grave risk of fraud and identity theft—consequences of the Data Breach that they will have to deal with for the rest of their lives.

### C. Vanguard Failed to Comply with FTC Guidelines

42. Vanguard was prohibited by the Federal Trade Commission Act (the "FTC Act") (15 U.S.C. § 45) from engaging in "unfair or deceptive acts or practices in or affecting commerce." The Federal Trade Commission (the "FTC") has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of the FTC Act. *See, e.g., FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236 (3d Cir. 2015).

43. The FTC has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.

---

[12] Hackmanac (@H4ckmanac), X (Jan. 7, 2026), https://x.com/H4ckmanac/status/2009149769952972976.

[13] ThreatMon (@MonThreat), X (Oct. 16, 2026), https://x.com/MonThreat/status/2111120347026125224.

44. In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established cyber-security guidelines for businesses. The guidelines note that businesses should protect the personal customer information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.[14] The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[15]

45. The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.[16]

46. The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security

---

[14] *See Protecting Personal Information: A Guide for Business*, FED. TRADE COMM'N (Oct. 2016), https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf.

[15] *Id.*

[16] *Id.*

obligations.

47. Vanguard failed to properly implement basic data security practices.

48. Vanguard's failure to employ reasonable and appropriate measures to protect against unauthorized access to clients' Private Information constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

49. Vanguard was at all times fully aware of the obligation to protect the Private Information of clients. Vanguard was also aware of the significant repercussions that would result from its failure to do so.

### D. Vanguard Failed to Comply with the Gramm-Leach-Bliley Act and Regulation S-P

50. Vanguard and its affiliates are registered investment advisers, broker-dealers, and sponsors of registered investment companies. As such, Vanguard is a financial institution subject to the Gramm-Leach-Bliley Act ("GLBA"), 15 U.S.C. § 6801 et seq., and to the Securities and Exchange Commission's ("SEC") Regulation S-P, 17 C.F.R. Part 248, which implements the GLBA for SEC-regulated financial institutions.

51. The GLBA declares that each financial institution "has an affirmative and continuing obligation to respect the privacy of its customers and to protect the security and confidentiality of those customers' nonpublic personal information." 15 U.S.C. § 6801(a).

52. Regulation S-P's Safeguards Rule requires covered institutions to adopt written policies and procedures addressing administrative, technical, and physical safeguards that are reasonably designed to ensure the security and confidentiality of customer information, protect against anticipated threats or hazards to its security or integrity, and protect against unauthorized access to or use of customer information that could result in substantial harm or inconvenience to any customer. 17 C.F.R. § 248.30(a).

53. In May 2024, the SEC amended Regulation S-P to require covered institutions to maintain an incident response program reasonably designed to detect, respond to, and recover from unauthorized access to or use of customer information, and to notify individuals whose sensitive customer information was, or is reasonably likely to have been, accessed or used without authorization as soon as practicable, but not later than 30 days, after becoming aware of the incident.[17] Larger entities such as Vanguard were required to comply with the amended rule by December 3, 2025.

54. Upon information and belief, Vanguard failed to maintain safeguards that complied with the GLBA and Regulation S-P, as evidenced by the Data Breach itself.

55. Vanguard's failure to comply with these standards, which were designed to protect individuals like Plaintiff and Class Members, is further evidence of its negligence.

**E. Vanguard Breached its Duty to Safeguard Plaintiff's and Class Members' Private Information**

56. In addition to its obligations under federal and state laws, Vanguard owed a duty to Plaintiff and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the Private Information in its possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons. Vanguard owed a duty to Plaintiff and Class Members to provide reasonable security, including consistency with industry standards and requirements and adequately training its employees and others who accessed Private Information within its computer systems, and to ensure that its computer systems, networks, and

[17] Press Release, SEC, SEC Adopts Rule Amendments to Regulation S-P to Enhance Protection of Customer Information (May 16, 2024), https://www.sec.gov/news/press-release/2024-58; *see also* Regulation S-P: Privacy of Consumer Financial Information and Safeguarding Customer Information, Exchange Act Release No. 34-100155 (May 16, 2024), https://www.sec.gov/files/rules/final/2024/34-100155.pdf.

protocols adequately protected the Private Information of its clients.

57. Vanguard owed a duty to Plaintiff and Class Members to implement processes that would detect a compromise of Private Information in a timely manner, to act upon data security warnings and alerts in a timely fashion, and to disclose in a timely and accurate manner when and how the Data Breach occurred.

58. Vanguard owed a duty of care to Plaintiff and Class Members because they were foreseeable and probable victims of any inadequate data security practices.

59. Vanguard breached its obligations to Plaintiff and Class Members and/or was otherwise negligent and reckless because it failed to properly maintain and safeguard its computer systems and data. Vanguard's unlawful conduct includes, but is not limited to, the following acts and/or omissions:

a. Failing to maintain an adequate data security system to reduce the risk of data breaches and cyber-attacks;

b. Failing to adequately protect clients' Private Information;

c. Failing to properly monitor its own data security systems for existing intrusions;

d. Failing to ensure that its vendors with access to its computer systems and data employed reasonable security procedures;

e. Failing to detect unauthorized ingress into its systems;

f. Failing to implement and monitor reasonable network segmentation to detect unauthorized travel within its systems, including to and from areas containing the most sensitive data;

g. Failing to detect unauthorized exfiltration of the most sensitive data on its systems;

h. Failing to train its employees in the proper handling of emails containing Private Information and maintain adequate email security practices;

i. Failing to comply with FTC guidelines for cybersecurity, in violation of Section 5 of the FTC Act;

j. Failing to adhere to industry standards for cybersecurity as discussed above; and

k. Otherwise breaching its duties and obligations to protect Plaintiff's and Class Members' Private Information.

60. Vanguard negligently and unlawfully failed to safeguard Plaintiff's and Class Members' Private Information by allowing cyberthieves to access its computer network and systems which contained unsecured and unencrypted Private Information.

61. Had Vanguard remedied the deficiencies in its information storage and security systems, followed industry guidelines, and adopted security measures recommended by experts in the field, Vanguard could have prevented intrusion into its information storage and security systems and, ultimately, the theft of Plaintiff's and Class Members' confidential PII.

62. However, due to Vanguard's failures, Plaintiff and Class Members now face an increased risk of fraud and identity theft. In addition, Plaintiff and the Class Members also lost the benefit of the bargain they made with Vanguard.

**F. Vanguard Knew or Should Have Known that Criminals Target Private Information**

63. Vanguard's data security obligations were particularly important given the substantial increase in cyberattacks and/or data breaches in industries holding significant amounts of PII preceding the date of the Breach.

64. At all relevant times, Vanguard knew, or should have known, Plaintiff's and Class Members' Private Information was a target for malicious actors. Despite such knowledge, Vanguard failed to implement and maintain reasonable and appropriate data privacy and security measures to protect Plaintiff's and Class Members' Private Information from cyber-attacks that Vanguard should have anticipated and guarded against.

65. Upon information and belief, the Data Breach resulted from a targeted attack designed to gain access to and exfiltrate private and confidential data, including (among other things) the Private Information of clients like Plaintiff and Class Members.

66. Private Information is a valuable property right.[18] The value of Private Information as a commodity is measurable.[19] "Firms are now able to attain significant market valuations by employing business models predicated on the successful use of personal data within the existing legal and regulatory frameworks."[20] American companies are estimated to have spent over $19 billion on acquiring personal data of consumers in 2018.[21] Private Information is so valuable to identity thieves that once Private Information has been disclosed, criminals often trade it on the "cyber black-market," or the "dark web," for many years.

67. As a result of its real value and the recent large-scale data breaches, identity thieves and cyber criminals have openly posted credit card numbers, SSNs, Private Information, and other sensitive information directly on various Internet websites, making the information publicly

---

[18] *See* Marc van Lieshout, *The Value of Personal Data*, 457 IFIP ADVANCES IN INFO. & COMM'N TECH. 26 (May 2015), https://www.researchgate.net/publication/283668023_The_Value_of_Personal_Data ("The value of [personal] information is well understood by marketers who try to collect as much data about personal conducts and preferences as possible[.]") (last visited November 10, 2026).

[19] *See* Robert Lowes, *Stolen EHR Charts Sell for $50 Each on Black Market*, MEDSCAPE (Apr. 28, 2014), http://www.medscape.com/viewarticle/824192 (last visited November 10, 2026).

[20] *Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value*, OECD 4 (Apr. 2, 2013), https://www.oecd-ilibrary.org/science-and-technology/exploring-the-economics-of-personal-data_5k486qtxldmq-en (last visited November 10, 2026).

[21] *U.S. Firms to Spend Nearly $19.2 Billion on Third-Party Audience Data and Data-Use Solutions in 2018, Up 17.5% from 2017*, INTERACTIVE ADVERTISING BUREAU (Dec. 5, 2018), https://www.iab.com/news/2018-state-of-data-report/ (last visited November 10, 2026).

available. This information from various breaches, including the information exposed in the Data Breach, can be aggregated and become more valuable to thieves and more damaging to victims.

68. Financial institutions are especially attractive targets. The Private Information they hold—Social Security numbers, account information, and detailed financial profiles—can be used not only to commit identity theft, but also to take over victims' existing financial and investment accounts directly. A financial institution of Vanguard's size and sophistication knew, or should have known, that it was a prime target for such attacks.

69. For clients of a brokerage, retirement, and investment-management firm like Vanguard, the danger is acute. Armed with a client's name and Social Security number, a criminal can impersonate the client to Vanguard's customer-service representatives, reset online account credentials, redirect account communications, and attempt to transfer, withdraw, or roll over the client's investments and retirement savings. The same information can be used to open new brokerage, bank, or credit accounts in the client's name. And because the compromised information identifies its victims as Vanguard investors—individuals who, by definition, hold investable assets—it is especially valuable to criminals running targeted phishing and impersonation schemes.

70. Consumers place a high value on the privacy of their Private Information. Researchers shed light on how much consumers value their data privacy—and the amount is considerable. Indeed, studies confirm that "when privacy information is made more salient and accessible, some consumers are willing to pay a premium to purchase from privacy protective websites."[22]

---

[22] Janice Y. Tsai et al., *The Effect of Online Privacy Information on Purchasing Behavior, An Experimental Study*, 22(2) INFO. SYS. RSCH. 254 (June 2011),

71. Given these facts, any company that transacts business with a consumer and then compromises the privacy of consumers' Private Information has thus deprived that consumer of the full monetary value of the consumer's transaction with the company.

72. Indeed, cyberattacks have been common for over fifteen years with the FBI warning as early as 2011 that cybercriminals were "advancing their abilities to attack a system remotely" and "[o]nce a system is compromised, cyber criminals will use their accesses to obtain PII." The FBI further warned that that "the increasing sophistication of cyber criminals will no doubt lead to an escalation in cybercrime."[23]

### G. Cyberattacks and Data Breaches Cause Disruption and Put Consumers at an Increased Risk of Fraud and Identity Theft

73. Cyberattacks and data breaches are especially problematic because they can negatively impact the overall daily lives of individuals affected by the attack.

74. The United States Government Accountability Office released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[24]

75. That is because any victim of a data breach is exposed to serious ramifications regardless of the nature of the data. Indeed, the reason criminals steal personally identifiable

---

https://www.researchgate.net/publication/221599126_The_Effect_of_Online_Privacy_Information_on_Purchasing_Behavior_An_Experimental_Study (last visited November 10, 2026).

[23] Gordon M. Snow, *Statement before the House Financial Services Committee, Subcommittee on Financial Institutions and Consumer Credit*, FBI (Sept. 14, 2011), https://archives.fbi.gov/archives/news/testimony/cyber-security-threats-to-the-financial-sector (last visited November 10, 2026).

[24] *See Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown*, U.S. GOV'T ACCOUNTABILITY OFF. (June 2007), https://www.gao.gov/assets/gao-07-737.pdf (last visited November 10, 2026).

information is to monetize it. They do this by selling the spoils of their cyberattacks on the black market to identity thieves who desire to extort and harass victims, take over victims' identities in order to engage in illegal financial transactions under the victims' names. Because a person's identity is akin to a puzzle, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity, or otherwise harass or track the victim. For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails.

76. Theft of Private Information is serious. The FTC warns consumers that identity thieves use Private Information to exhaust financial accounts, receive medical treatment, start new utility accounts, and incur charges and credit in a person's name.

77. The FTC recommends that identity theft victims take several steps to protect their personal and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert (and consider an extended fraud alert that lasts for 7 years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[25]

---

[25] *See IdentityTheft.gov*, FED. TRADE COMM'N, https://www.identitytheft.gov/Steps (last visited November 10, 2026).

78. Identity thieves use stolen personal information such as Social Security numbers for a variety of crimes, including credit card fraud, phone or utilities fraud, and bank/finance fraud. According to Experian, one of the largest credit reporting companies in the world:

> Identity thieves can use your personal information, such as your Social Security number, to impersonate you and carry out any number of illicit schemes. For example, criminals might be able to use your information to apply for government benefits, such as unemployment. They may also use your information to file a fraudulent tax return, making up numbers or information to guarantee they get a large refund. . . .
> Criminals can try to take over your accounts, including bank, credit card, phone, ecommerce and loyalty program accounts. They can then try to steal anything of value, from directly transferring funds to using your gift cards or points. They could also try to change your password, email, username, phone number or PIN to make it difficult for you to quickly respond.[26]

79. Moreover, theft of Private Information is also gravely serious because Private Information is an extremely valuable property right.[27]

80. Each year, identity theft causes tens of billions of dollars of losses to victims in the United States. For example, with the Private Information stolen in the Data Breach, which includes Social Security numbers, identity thieves can open financial accounts, apply for credit, file fraudulent tax returns, commit crimes, create false driver's licenses and other forms of identification, steal government benefits, give breach victims' names to police during arrests, and

---

[26] Louis DeNicola, *What Can Identity Thieves Do With Your Personal Info and How Can You Protect Yourself?*, EXPERIAN (April 8, 2025), https://www.experian.com/blogs/ask-experian/what-can-identity-thieves-do-with-your-personal-information-and-how-can-you-protect-yourself/ (last visited November 10, 2026).

[27] *See, e.g.,* John T. Soma, et al, *Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets*, 15 RICH. J.L. & TECH. 11, at *3-4 (2009), https://scholarship.richmond.edu/jolt/vol15/iss4/2/ ("PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted) (last visited November 10, 2026).

many other harmful forms of identity theft. These criminal activities have and will result in devastating financial and personal losses to Plaintiff and Class Members.

81. Private Information is such a valuable commodity to identity thieves that once the information has been compromised, criminals often trade the information on the "cyber black-market" for years.

82. There is a strong probability that entire batches of stolen information have been dumped on the black market and are yet to be dumped on the black market, meaning Plaintiff and Class Members are at an increased risk of fraud and identity theft for many years into the future.

83. For example, it is believed that certain highly sensitive personal information compromised in the 2017 Experian data breach was being used, three years later, by identity thieves to apply for COVID-19-related unemployment benefits.

84. Cyber criminals may not use the information right away. According to the U.S. Government Accountability Office, which conducted a study regarding data breaches:

> [I]n some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[28]

85. Social security numbers are particularly sensitive pieces of personal information. With a stolen Social Security number, which is only one subset of the Private Information

[28] *Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown*, GOV'T ACCOUNTABILITY OFF. (July 5, 2007), https://www.gao.gov/assets/a262904.html (last visited November 10, 2026).

compromised in the Data Breach, someone can open financial accounts, get medical care, file fraudulent tax returns, commit crimes, and steal benefits.[29]

86. The Social Security Administration has warned that identity thieves can use an individual's Social Security number to apply for additional credit lines. Such fraud may go undetected until debt collection calls commence months, or even years, later. Stolen Social Security Numbers also make it possible for thieves to file fraudulent tax returns, file for unemployment benefits, or apply for a job using a false identity. Each of these fraudulent activities is difficult to detect. An individual may not know that his or her Social Security Number was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.[30]

87. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. Even then, a new Social Security number may not be effective, as "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[31]

88. This was a financially motivated Data Breach, as the only reason the cybercriminals go through the trouble of running a targeted cyberattack against companies like Vanguard is to get

---

[29] *See, e.g.*, Christine DiGangi, *5 Things an Identity Thief Can Do With Your Social Security Number*, YAHOO! (Feb. 17, 2015), https://finance.yahoo.com/news/5-things-identity-thief-social-113031894.html (last visited November 10, 2026).

[30] *Id.*

[31] Brian Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millions-worrying-about-identity-theft (last visited November 10, 2026).

information that they can monetize by selling on the black market for use in the kinds of criminal activity described herein. This data demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "[c]ompared to credit card information, personally identifiable information and Social Security Numbers are worth more than 10x in price on the black market."[32]

89. Indeed, a social security number, date of birth, and full name can sell for $60 to $80 on the digital black market.[33] "[I]f there is reason to believe that your personal information has been stolen, you should assume that it can end up for sale on the dark web."[34]

90. These risks are both certainly impending and substantial. As the FTC has reported, if hackers get access to PII, they *will use it.*

91. Identity theft is not an easy problem to solve. The Identity Theft Resource Center documents the multitude of harms caused by fraudulent use of PII in its 2023 Consumer Impact Report.[35] After interviewing over 14,000 identity crime victims, researchers found that as a result of the criminal misuse of their PII:

77-percent experienced financial-related problems;

29-percent experienced financial losses exceeding $10,000;

---

[32] Tim Greene, *Anthem Hack: Personal Data Stolen Sells for 10X Price of Stolen Credit Card Numbers*, NETWORK WORLD (Feb. 6, 2015), https://www.networkworld.com/article/2880366/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html (last visited November 10, 2026).

[33] Michael Kan, *Here's How Much Your Identity Goes for on the Dark Web*, PC MAG. (Nov. 15, 2017), https://www.pcmag.com/news/heres-how-much-your-identity-goes-for-on-the-dark-web (last visited November 10, 2026).

[34] *Dark Web Monitoring: What You Should Know*, CONSUMER FED'N AM. (Mar. 19, 2019), https://nationalcybersecurity.com/what-you-should-know-%C2%B7-consumer-federation-of-america-deepweb/ (last visited November 10, 2026).

[35] *2023 Consumer Impact Report*, IDENTITY THEFT RES. CTR., https://www.idtheftcenter.org/wp-content/uploads/2023/08/ITRC_2023-Consumer-Impact-Report_Final-1.pdf (last visited November 10, 2026).

40-percent were unable to pay bills;
28-percent were turned down for credit or loans;
37-percent became indebted;
87-percent experienced feelings of anxiety;
67-percent experienced difficulty sleeping; and
51-percent suffered from panic or anxiety attacks.[36]

92. Theft of SSNs also creates a particularly alarming situation for victims because those numbers cannot easily be replaced. In order to obtain a new number, a breach victim has to demonstrate ongoing harm from misuse of the SSN, and a new SSN will not be provided until after the victim has suffered the harm.

93. Due to the highly sensitive nature of SSNs, theft of SSNs in combination with other PII (e.g., name, address, date of birth) is akin to having a master key to the gates of fraudulent activity. TIME quotes data security researcher Jim Stickley, who is employed by companies to find flaws in their computer systems, as stating, "If I have your name and your Social Security number and you haven't gotten a credit freeze yet, you're easy pickings."[37]

94. There may also be a time lag between when sensitive personal information is stolen, when it is used, and when a person discovers it has been used. Fraud and identity theft resulting from the Data Breach may go undetected until debt collection calls commence months, or even years, later. An individual may not know that his or her Social Security Number was used to file for unemployment benefits until law enforcement notifies the individual's employer of the

---

[36] *Id.* at pp. 21-25.

[37] Patrick Lucas Austin, *'It Is Absurd.' Data Breaches Show it's Time to Rethink How We Use Social Security Numbers, Experts Say*, TIME (Aug. 5, 2019, 3:39 PM), https://time.com/5643643/capital-one-equifax-data-breach-social-security/ (last visited November 10, 2026).

suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

95. For example, on average it takes approximately three months for consumers to discover their identity has been stolen and used, and it takes some individuals up to three years to learn that information.[38]

96. Cybercriminals can post stolen Private Information on the cyber black-market for years following a data breach, thereby making such information publicly available.

97. Approximately 16% of victims do not realize their identity has been compromised until more than three years after it has happened.[39] This gives thieves ample time to open new accounts, drain existing ones, and commit other fraud in the victim's name.

98. Identity theft victims must spend countless hours and large amounts of money repairing the impact to their credit as well as protecting themselves in the future.[40]

99. It is within this context that Plaintiff and all other Class Members must now live with the knowledge that their Private Information is forever in cyberspace and was taken by people willing to use that information for any number of improper purposes and scams, including making the information available for sale on the black market.

100. A study by the Identity Theft Resource Center shows the multitude of harms caused by fraudulent use of personal and financial information:

---

[38] John W. Coffey, *Difficulties in Determining Data Breach Impacts*, 17 J. SYSTEMICS, CYBERNETICS & INFORMATICS 9 (2019), https://www.iiisci.org/journal/sci/FullText.asp?var=&id=IP069LL19 (last visited November 10, 2026).

[39] *Id*.

[40] *Id*. at 2.




101. Victims of the Data Breach, like Plaintiff and Class Members, must spend many hours and large amounts of money protecting themselves from the current and future negative impacts to their privacy and credit because of the Data Breach.

102. As a direct and proximate result of the Data Breach, Plaintiff and Class Members have had their Private Information exposed, have suffered harm, and have been placed at an imminent, immediate, and continuing increased risk of harm from fraud and identity theft. Plaintiff and Class Members must now take the time and effort (and spend the money) to mitigate the actual and potential impact of the Data Breach on their everyday lives, including purchasing identity theft and credit monitoring services every year for the rest of their lives, placing "freezes" and "alerts" with credit reporting agencies, contacting their financial institutions, closing or modifying financial and investment accounts, and closely reviewing and monitoring their bank, brokerage, and retirement accounts and credit reports for unauthorized activity for years to come.

103. Plaintiff and Class Members have suffered or will suffer actual harms for which they are entitled to compensation, including but not limited to the following:

a. Actual identity theft, including fraudulent credit inquiries and cards being opened in their names;

b. Unauthorized access to, and takeover of, their Vanguard and other financial and investment accounts, including through impersonation, social engineering, and fraudulent credential resets;

c. Trespass, damage to, and theft of their personal property, including Private Information;

d. Improper disclosure of their Private Information;

e. The imminent and certainly impending injury flowing from actual and potential future fraud and identity theft posed by their Private Information being in the hands of criminals and having already been misused;

f. Damages flowing from Vanguard's untimely and inadequate notification of the Data Breach;

g. Loss of privacy suffered as a result of the Data Breach;

h. Ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably expended to remedy or mitigate the effects of the Data Breach;

i. Ascertainable losses in the form of deprivation of the value of clients' personal information for which there is a well-established and quantifiable national and international market;

j. The loss of use of and access to their credit, accounts, and/or funds;

k. Damage to their credit due to fraudulent use of their Private Information; and

l. Increased cost of borrowing, insurance, deposits, and other items which are adversely affected by a reduced credit score.

104. Moreover, Plaintiff and Class Members have an interest in ensuring that their Private Information, which remains in the possession of Vanguard, is protected from further public disclosure by the implementation of better employee training and industry standard and statutorily compliant security measures and safeguards. Vanguard has shown itself to be wholly incapable of protecting Plaintiff's and Class Members' Private Information.

105. Plaintiff and Class Members also have an interest in ensuring that their Private Information that was provided to Vanguard is removed from Vanguard's unencrypted files.

106. Given the kind of Private Information Vanguard made accessible to hackers, Plaintiff is certain to incur damages. Because identity thieves have their Private Information, Plaintiff and all Class Members will need to have identity theft monitoring protection for the rest of their lives. Some may even need to go through the long and arduous process of getting a new Social Security number, with all the loss of credit and employment difficulties that come with a new number.[41] None of this should have happened.

**H. The Data Breach Was Foreseeable and Preventable**

107. Data security breaches have dominated the headlines for the last two decades, and the financial services industry has been hit especially hard. In 2017, hackers stole the Social Security numbers and other personal information of approximately 147 million consumers from credit reporting agency Equifax.[42] In 2019, a hacker accessed the personal information of approximately 106 million Capital One credit card customers and applicants.[43] In October 2024, Fidelity Investments—one of Vanguard's principal competitors—disclosed that a third party had obtained the personal information, including Social Security numbers, of more than 77,000 of its

---

[41] *What happens if I change my Social Security number?*, LEXINGTON LAW (Aug. 10, 2022), https://www.lexingtonlaw.com/blog/credit-101/will-a-new-social-security-number-affect-your-credit.html (last visited November 10, 2026).

[42] *See* Press Release, Consumer Fin. Prot. Bureau, CFPB, FTC and States Announce Settlement with Equifax Over 2017 Data Breach (July 22, 2019), https://www.consumerfinance.gov/archive/newsroom/cfpb-ftc-states-announce-settlement-with-equifax-over-2017-data-breach/ (last visited November 10, 2026).

[43] *See* Capital One Breach Exposes 106M Customers' Data, BANKING DIVE (July 30, 2019), https://bankingdive.com/news/capital-one-breach-exposes-106m-customers-data/559844 (last visited November 10, 2026).

customers.[44] And in May 2025, Coinbase disclosed that criminals had bribed overseas customer-support personnel to steal customer data, which was then used to impersonate Coinbase and defraud its customers.[45]

108. Vanguard should certainly have been aware, and indeed was aware, that it was at risk for a data breach that could expose the Private Information that it collected and maintained. As one of the largest financial institutions in the world, holding the Social Security numbers and financial information of tens of millions of investors, Vanguard was an obvious target—and, as alleged above, Vanguard had reported prior data security incidents to state regulators and had been the subject of public claims by threat actors before the Data Breach was reported.

109. Vanguard was clearly aware of the risks it was taking and the harm that could result from inadequate data security, and it could have prevented this Data Breach.

110. Data disclosures and data breaches are preventable.[46] As Lucy Thomson wrote in the Data Breach and Encryption Handbook, "In almost all cases, the data breaches that occurred could have been prevented by proper planning and the correct design and implementation of appropriate security solutions." *Id.* She added that "[o]rganizations that collect, use, store, and share sensitive personal data must accept responsibility for protecting the information and ensuring that it is not compromised[.]" *Id.*

---

[44] *See* Fidelity Reports Data Breach Exposing 77,000 Customers' Personal Data, INVESTMENTNEWS (Oct. 10, 2024), https://www.investmentnews.com/industry-news/fidelity-reports-data-breach-exposing-77000-customers-personal-data/257642 (last visited November 10, 2026).

[45] *See* Pierluigi Paganini, Coinbase Disclosed a Data Breach After an Extortion Attempt, SECURITY AFFAIRS (May 15, 2025), https://securityaffairs.com/177878/cyber-crime/coinbase-disclosed-a-data-breach-after-an-extortion-attempt.html (last visited November 10, 2026).

[46] Lucy L. Thomson, *Despite the Alarming Trends, Data Breaches Are Preventable*, *in* DATA BREACH AND ENCRYPTION HANDBOOK (Lucy Thomson, ed., 2012).

111. "Most of the reported data breaches are a result of lax security and the failure to create or enforce appropriate security policies, rules, and procedures … Appropriate information security controls, including encryption, must be implemented and enforced in a rigorous and disciplined manner so that a *data breach never occurs*." *Id.*

112. In a Data Breach like this, many failures laid the groundwork for the Breach. The FTC has published guidelines that establish reasonable data security practices for businesses. The FTC guidelines emphasize the importance of having a data security plan, regularly assessing risks to computer systems, and implementing safeguards to control such risks.[47] The guidelines establish that businesses should protect the confidential information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies for installing vendor-approved patches to correct security problems. The guidelines also recommended that businesses utilize an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating hacking attempts; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.

113. Upon information and belief, Vanguard failed to maintain many reasonable industry standards necessary to prevent a data breach, including the FTC's guidelines. Upon information and belief, Vanguard also failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework, NIST Special Publications 800-53, 53A, or 800-171; the Federal Risk and Authorization Management Program (FEDRAMP); or the Center for Internet Security's Critical Security Controls (CIS CSC), which are well respected authorities in reasonable cybersecurity readiness.

---

[47] *Protecting Personal Information: A Guide for Business*, *supra note 14.*

114. In August 2022, the Consumer Financial Protection Bureau (CFPB) published a circular on data security. The CFPB noted that "[w]idespread data breaches and cyberattacks have resulted in significant harms to consumers, including monetary loss, identity theft, significant time and money spent dealing with the impacts of the breach, and other forms of financial distress," and the circular concluded that the provision of insufficient security for consumers' data can violate the prohibition on "unfair acts or practices" in the Consumer Financial Protection Act (CFPA).[48]

115. Given that Vanguard was storing the Private Information of millions of individuals, Vanguard could and should have implemented all of the above measures to prevent and detect cyberattacks. These are basic, common-sense security measures that every financial institution should employ.

116. Specifically, among other failures, Vanguard had far too much confidential unencrypted information held on its systems. Such Private Information should have been segregated into an encrypted system.[49]

117. Charged with handling sensitive Private Information, Vanguard knew, or should have known, the importance of safeguarding its clients' Private Information that was entrusted to it and of the foreseeable consequences if its data security systems were breached. This includes the significant costs that would be imposed on its clients after a breach. Vanguard failed, however, to take adequate cybersecurity measures to prevent the Data Breach from occurring.

---

[48] *Consumer Financial Protection Circular 2022-04: Insufficient Data Protection or Security for Sensitive Consumer Information*, CONSUMER FINANCIAL PROTECTION BUREAU, https://www.consumerfinance.gov/compliance/circulars/circular-2022-04-insufficient-data-protection-or-security-for-sensitive-consumer-information/ (last visited November 10, 2026).

[49] *See, e.g.*, Adnan Raja, *How to Safeguard Your Business Data with Encryption*, DIGITAL GUARDIAN (Aug. 14, 2018), https://digitalguardian.com/blog/how-safeguard-your-business-data-encryption (last visited November 10, 2026).

118. With respect to training, Defendant specifically failed to:

a) Implement a variety of anti-phishing and cybersecurity training tools, in combination, such as computer-based training, classroom training, monthly newsletters, posters, login alerts, email alerts, and team-based discussions;

b) Perform regular training at defined intervals such as bi-annual training and/or monthly security updates; and

c) Craft and tailor different approaches to different employees based on their base knowledge about technology and cybersecurity.

119. The Private Information was also maintained on Vanguard's computer system in a condition vulnerable to cyberattacks, such as through the infiltration of Defendant's systems by cybercriminals. The mechanism of the cyberattack and the potential for improper disclosure of Plaintiff's and Class Members' Private Information was a known risk to Vanguard, and thus Vanguard was on notice that failing to take reasonable steps necessary to secure the Private Information from those risks left it in a vulnerable position.

120. In sum, this Data Breach could have readily been prevented through the use of industry standard network segmentation and encryption of all confidential information.

121. Plaintiff and Class Members entrusted their Private Information to Vanguard as a condition of opening accounts and receiving the financial services Vanguard offers. Plaintiff and Class Members understood and expected that Vanguard or anyone in Vanguard's position would safeguard their Private Information against cyberattacks, delete or destroy Private Information that Vanguard was no longer required to maintain, and timely and accurately notify them if their Private Information was compromised.

**I. The Monetary Value of Privacy Protections and Private Information**

122. The fact that Plaintiff's and Class Members' Private Information was stolen means that Class Members' Private Information is likely for sale by cybercriminals and will be misused in additional instances in the future.

123. At all relevant times, Vanguard was well aware that the Private Information it collects from Plaintiff and Class Members is highly sensitive and of significant value to those who would use it for wrongful purposes.

124. As discussed above, Private Information is a valuable commodity to identity thieves. As the FTC recognizes, identity thieves can use this information to commit an array of crimes including identity theft, and medical and financial fraud.[50]

125. At an FTC public workshop in 2001, then-Commissioner Orson Swindle described the value of a consumer's personal information:

> The use of third party information from public records, information aggregators and even competitors for marketing has become a major facilitator of our retail economy. Even [Federal Reserve] Chairman [Alan] Greenspan suggested here some time ago that it's something on the order of the life blood, the free flow of information.[51]

126. Commissioner Swindle's 2001 remarks are even more relevant today, as consumers' personal data functions as a "new form of currency" that supports a $26 billion per year online advertising industry in the United States.[52]

---

[50] *Warning Signs of Identity Theft*, FED. TRADE COMM'N (Sept. 2018), https://www.identitytheft.gov/Warning-Signs-of-Identity-Theft (last visited November 10, 2026).

[51] *Public Workshop: The Information Marketplace: Merging and Exchanging Consumer Data*, FED. TRADE COMM'N Tr. at 8:2-8 (Mar. 13, 2001), https://www.ftc.gov/sites/default/files/documents/public_events/information-marketplace-merging-and-exchanging-consumer-data/transcript.pdf (last visited November 10, 2026).

[52] Rick Barrett, *Time Warner Cable Privacy Lawsuit Dismissed by Wisconsin Judge*, MILWAUKEE J. SENTINEL (June 19, 2016, at 11:00 PM CT), https://www.jsonline.com/story/money/business/2016/06/20/time-warner-cable-privacy-lawsuit-dismissed-by-wisconsin-judge/86168184 (last visited November 10, 2026).

127. The FTC has also recognized that consumer data is a new (and valuable) form of currency. In an FTC roundtable presentation, another former Commissioner, Pamela Jones Harbour, underscored this point:

> Most consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable. Data is currency. The larger the data set, the greater potential for analysis—and profit.[53]

128. Recognizing the high value that consumers place on their Private Information, many companies now offer consumers an opportunity to sell this information. The idea is to give consumers more power and control over the type of information that they share and who ultimately receives that information. And, by making the transaction transparent, consumers will make a profit from their Private Information. This business has created a new market for the sale and purchase of this valuable data.

129. Consumers place a high value not only on their Private Information, but also on the privacy of that data. Researchers have begun to shed light on how much consumers value their data privacy, and the amount is considerable. Indeed, studies confirm that the average direct financial loss for victims of identity theft in 2014 was $1,349.[54]

130. As discussed above, the value of Plaintiff's and Class Members' Private Information on the black market is substantial.

---

[53] *Statement of FTC Commissioner Pamela Jones Harbour—Remarks Before FTC Exploring Privacy Roundtable*, FED. TRADE COMM'N (Dec. 7, 2009), https://www.ftc.gov/sites/default/files/documents/public_statements/remarks-ftc-exploring-privacy-roundtable/091207privacyroundtable.pdf (last visited November 10, 2026).

[54] Erika Harrell, *Victims of Identity Theft*, 2014, U.S. DEP'T JUSTICE (Nov. 13, 2017), https://bjs.ojp.gov/content/pub/pdf/vit14.pdf (last visited November 10, 2026).

131. The ramifications of Vanguard's failure to keep its clients' Private Information secure are long-lasting and severe. Once Private Information is stolen, fraudulent use of that information and damage to victims may continue for years.

132. Victims may not realize their identity has been compromised until long after it has happened.[55]

133. At all relevant times, Defendant was well-aware, or reasonably should have been aware, that the Private Information it maintains is highly sensitive and could be used for wrongful purposes by third parties, such as identity theft and fraud.

134. Had Vanguard remedied the deficiencies in its security systems, followed industry guidelines, and adopted security measures recommended by experts in the field, Defendant would have prevented the Data Breach and, ultimately, the theft of its clients' Private Information.

135. Information about, or related to, an individual for which there is a possibility of logical association with other information is of great value to hackers and thieves. Indeed, "there is significant evidence demonstrating that technological advances and the ability to combine disparate pieces of data can lead to identification of a consumer, computer or device even if the individual pieces of data do not constitute PII."[56] For example, different PII elements from various sources may be able to be linked in order to identify an individual, or access additional information about or relating to the individual.[57] The cybercriminals responsible for the Data Breach can easily

---

[55] *See* Coffey, *Difficulties in Determining Data Breach Impacts*, *supra note 36.*

[56] *Protecting Consumer Privacy in an Era of Rapid Change: Recommendations for Businesses and Policymakers* at 20, FED. TRADE COMM'N (March 2012), https://www.ftc.gov/sites/default/files/documents/reports/federal-trade-commission-report-protecting-consumer-privacy-era-rapid-change-recommendations/120326privacyreport.pdf (last visited November 10, 2026).

[57] *See id* at 15-22 (evaluating privacy framework for entities collecting or using consumer data

utilize the Private Information it obtained through the Data Breach to obtain additional information from Plaintiff and Class Members.

136. In addition, as technology advances, computer programs may scan the Internet with wider scope to create a mosaic of information that may be used to link information to an individual in ways that were not previously possible. This is known as the "mosaic effect."

137. Names and dates of birth, combined with contact information like telephone numbers and email addresses, are very valuable to hackers and identity thieves as it allows them to access users' other accounts. Thus, even if payment card information was not involved in the Data Breach, the unauthorized parties could use Plaintiff's and Class Members' Private Information to access accounts, including, but not limited to email accounts and financial accounts, to engage in the fraudulent activity described herein.

138. Given these facts, any entity that transacts business with customers and then compromises the privacy of its customers' Private Information has thus deprived them of the full monetary value of the transaction with the entity.

139. In short, the Private Information exposed is of great value to hackers and cyber criminals and the data compromised in the Data Breach can be used in a variety of unlawful manners, including opening new credit and financial accounts in users' names.

**J. The Data Breach's Impact on Plaintiff and Class Members**

140. Vanguard received Plaintiff's and Class Members' PII in connection with providing them with financial services. In requesting and maintaining Plaintiff's and Class Members' PII for business purposes, Vanguard expressly and impliedly promised, and undertook a duty, to act

---

with can be "reasonably linked to a specific consumer, computer, or other device").

reasonably in its handling of Plaintiff's and Class Members' PII. Vanguard, however, did not take proper care of Plaintiff's PII, leading to its exposure to and exfiltration by cybercriminals as a direct result of Vanguard's inadequate data security measures.

141. On or around November 4, 2026, Vanguard reported to the Vermont Attorney General that its clients' Private Information, including their Social Security numbers, had been compromised in the Data Breach.

142. Vanguard's inability to keep its clients' PII confidential and secure, which allowed the Data Breach to occur, caused Plaintiff significant injuries and harm, including but not limited to, the following—Plaintiff must devote time, energy, and money to: closely monitoring bills, records, and credit and financial accounts; changing login and password information on any sensitive account even more frequently than he already does; more carefully screening and scrutinizing phone calls, emails, and other communications to ensure that he is not being targeted in a social engineering or spear phishing attack; searching for suitable identity theft protection and credit monitoring services and paying for such services to protect himself; and placing fraud alerts and/or credit freezes on his credit file. Plaintiff has taken or will be forced to take these measures in order to mitigate his potential damages as a result of the Breach.

143. Once PII is exposed, there is virtually no way to ensure that the exposed information has been fully recovered or contained against future misuse. For this reason, Plaintiff will need to maintain these heightened measures for years, and possibly for the rest of his life.

144. Plaintiff greatly values his privacy. Plaintiff and Class Members did not receive the full benefit of their bargain when paying for services, and instead received services that were of a diminished value to those described in their agreements to receive financial services from Vanguard. Plaintiff and Class Members were damaged in an amount at least equal to the difference

in the value between the services they thought they paid for (which would have included adequate data security protection) and the services they actually received.

145. Plaintiff and Class Members would not have obtained services from Vanguard, or paid the amount they did to receive such, had they known that Vanguard would negligently fail to adequately protect their PII. Indeed, Plaintiff paid Vanguard for services with the expectation that Vanguard would keep his PII secure and inaccessible from unauthorized parties. Plaintiff and Class Members would not have obtained services from Vanguard had they known that Defendant failed to properly train its employees, lacked safety controls over its computer network, and did not have proper data security practices to safeguard their Private Information from criminal theft and misuse.

146. As a direct result of Defendant's intentional, willful, reckless, and negligent conduct which resulted in the Data Breach, unauthorized parties were able to access, acquire, view, publicize, and/or otherwise commit the identity theft and misuse of Plaintiff's and Class Members' Private Information as detailed above, and Plaintiff and members of the Class are at a heightened and increased substantial risk of suffering identity theft and fraud.

147. Plaintiff is also at a continued risk of harm because his PII remains in Vanguard's systems, which have already been shown to be susceptible to compromise and attack and are subject to further attack so long as Vanguard fails to undertake the necessary and appropriate data security measures to protect the PII in its possession.

148. As a result of the Data Breach, and in addition to the time Plaintiff has spent and anticipates spending to mitigate the impact of the Data Breach on his life, Plaintiff has also suffered emotional distress from the likely exposure on the dark web of his PII, which he believed would be protected from unauthorized access and disclosure. The emotional distress he has experienced

includes anxiety and stress resulting from the unauthorized bad actors viewing, selling, and misusing his PII for the purposes of identity theft and fraud.

149. Additionally, Plaintiff has suffered damage to and diminution in the value of his highly sensitive and confidential PII—a form of property that Plaintiff entrusted to Vanguard and which was compromised as a result of the Data Breach Vanguard failed to prevent. Plaintiff has also suffered a violation of his privacy rights as a result of Vanguard's unauthorized disclosure of his PII.

150. The risks associated with identity theft are serious. While some identity theft victims can resolve their problems quickly, others spend hundreds to thousands of dollars and many days repairing damage to their good name and credit record. Some consumers victimized by identity theft may lose out on job opportunities, or be denied loans for education, housing or cars because of negative information on their credit reports. In rare cases, they may even be arrested for crimes they did not commit.

151. In addition to a remedy for the economic harm, Plaintiff and Class Members maintain an undeniable interest in ensuring that their Private Information remains secure and is not subject to further misappropriation and theft.

## CLASS ALLEGATIONS

152. Plaintiff brings this class action, individually and on behalf of the following classes:

**Nationwide Class**

All persons residing in the United States whose Private Information was disclosed or otherwise impacted by the Data Breach.

**Pennsylvania Subclass**

All persons residing in Pennsylvania whose Private Information was disclosed or otherwise impacted by the Data Breach.

153. The Nationwide Class and the Pennsylvania Subclass are referred to collectively as the "Class," and the Pennsylvania Subclass individually as the "Subclass." Excluded from the Class are Vanguard's officers and directors; any entity in which Vanguard has a controlling interest; and the affiliates, legal representatives, attorneys, successors, heirs, and assigns of Vanguard. Excluded also from the Class are members of the judiciary to whom this case is assigned, their families and members of their staff.

154. Plaintiff reserves the right to amend the class definitions above if further investigation and/or discovery reveals that the Class should be expanded, narrowed, divided into subclasses, or otherwise modified in any way.

155. Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of his claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

156. Numerosity, Fed. R. Civ. P. 23(a)(1): The Members of the Class are so numerous that joinder of all of them is impracticable. While the exact number of Class Members is unknown to Plaintiff at this time, Vanguard has reported that the Data Breach affected at least 94 Vermont residents alone, and, based on information and belief, the Class consists of thousands of current and former Vanguard clients and other individuals across the United States whose sensitive data was compromised in the Data Breach.

157. **Commonality, Fed. R. Civ. P. 23(a)(2):** There are questions of law and fact common to the Class, which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

a. Whether Vanguard unlawfully used, maintained, lost, or disclosed Plaintiff's and Class Members' Private Information;

b. Whether Vanguard failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

c. Whether Vanguard's data security systems prior to and during the Data Breach complied with applicable data security laws and regulations;

d. Whether Vanguard's data security systems prior to and during the Data Breach were consistent with industry standards;

e. Whether Vanguard owed a duty to Class Members to safeguard their Private Information;

f. Whether Vanguard breached the duty to Class Members to safeguard their Private Information;

g. Whether Vanguard knew or should have known that its data security systems and monitoring processes were deficient;

h. Whether Vanguard should have discovered the Data Breach sooner;

i. Whether Plaintiff and Class Members suffered legally cognizable damages as a result of Vanguard's misconduct;

j. Whether Vanguard's conduct was negligent;

k. Whether Vanguard breached implied contracts with Plaintiff and Class Members;

l. Whether Vanguard was unjustly enriched by unlawfully retaining a benefit conferred upon them by Plaintiff and Class Members;

m. Whether Vanguard failed to provide notice of the Data Breach in a timely manner; and

n. Whether Plaintiff and Class Members are entitled to damages, civil penalties, and/or injunctive relief.

158. **Typicality, Fed. R. Civ. P. 23(a)(3)**: Plaintiff's claims are typical of those of other Class Members because Plaintiff's Private Information, like that of every other Class Member, was compromised in the Data Breach. Further, there are no defenses available to Defendant that are unique to Plaintiff.

159. **Adequacy of Representation, Fed. R. Civ. P. 23(a)(4):** Plaintiff will fairly and adequately represent and protect the interests of the Members of the Class. Plaintiff's Counsel is competent and experienced in litigating class actions.

160. **Injunctive Relief, Fed. R. Civ. P. 23(b)(2):** Defendant has acted and/or refused to act on grounds that apply generally to the Class therefore making injunctive and/or declarative relief appropriate with respect to the Class under 23(b)(2).

161. **Superiority, Fed. R. Civ. P. 23(b)(3):** A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most Class Members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Vanguard. In contrast, the conduct of this action as a Class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class Member.

162. Vanguard has acted on grounds that apply generally to the Class as a whole, so that Class certification, injunctive relief, and corresponding declaratory relief are appropriate on a Class-wide basis.

163. Likewise, particular issues are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

(a) Whether Vanguard failed to timely and adequately notify the public of the Data Breach;

(b) Whether Vanguard owed a legal duty to Plaintiff and the Class to exercise due care in collecting, storing, and safeguarding their Private Information;

(c) Whether Vanguard's security measures to protect its data systems were reasonable in light of best practices recommended by data security experts;

(d) Whether Vanguard's failure to institute adequate protective security measures amounted to negligence;

(e) Whether Vanguard failed to take commercially reasonable steps to safeguard consumer Private Information; and

(f) Whether adherence to FTC data security recommendations, and measures recommended by data security experts would have reasonably prevented the Data Breach.

164. Finally, all members of the proposed Class are readily ascertainable. Vanguard has access to Class Members' names and addresses affected by the Data Breach.

## CAUSES OF ACTION

### COUNT I
### NEGLIGENCE AND NEGLIGENCE PER SE
### (On Behalf of Plaintiff and the Class)

165. Plaintiff re-alleges and incorporates by reference each and every allegation set forth in the above paragraphs as though fully set forth herein.

166. Plaintiff brings this claim individually and on behalf of all Class Members.

167. Vanguard required clients, including Plaintiff and Class Members, to submit Private Information in the ordinary course of providing financial services.

168. By collecting and storing this data in its computer system and network, and sharing it and using it for commercial gain, Vanguard owed a duty of care to use reasonable means to secure and safeguard its computer system—and Plaintiff's and Class Members' Private Information held within it—to prevent disclosure of the information, and to safeguard the information from theft. Vanguard's duty included a responsibility to implement processes by

which it could detect a breach of its security systems in a reasonably expeditious period of time and to give prompt notice to those affected in the case of a data breach.

169. Vanguard owed a duty of care to Plaintiff and Class Members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that its systems and networks, and the personnel responsible for them, adequately protected the Private Information.

170. Under Pennsylvania law, an entity that requires individuals to provide sensitive personal information as a condition of doing business, and then stores that information on its computer systems, owes those individuals a duty to exercise reasonable care to protect that information from foreseeable cyberattacks, and the economic loss doctrine does not bar recovery for breach of that independent duty. *Dittman v. UPMC*, 196 A.3d 1036 (Pa. 2018).

171. Plaintiff and the Class are a well-defined, foreseeable, and probable group of clients that Vanguard was aware, or should have been aware, could be injured by inadequate data security measures.

172. Vanguard owed numerous duties to Plaintiff and the Class, including the following:

- To exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting and protecting Private Information in its possession;
- To protect Private Information using reasonable and adequate security procedures and systems that are compliant with industry-standard practices; and
- To implement processes to quickly detect a data breach and to timely act on warnings about data breaches.

173. A large depository of highly valuable Private Information is a foreseeable target for cybercriminals looking to steal and profit from that sensitive information. Vanguard knew or should have known that its repository of Private Information for millions of clients was at significant risk of being targeted for a data breach. Thus, Vanguard had a duty to reasonably

safeguard its clients' data by implementing reasonable data security measures to protect against data breaches. The foreseeable harm to Plaintiff and the Class of inadequate data security created a duty to act reasonably and safeguard the Private Information.

174. In addition, Vanguard has a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

175. Vanguard also had a duty to employ reasonable security measures under the GLBA, 15 U.S.C. § 6801, and Regulation S-P, 17 C.F.R. § 248.30, which require financial institutions such as Vanguard to protect the security and confidentiality of customers' nonpublic personal information and to timely notify affected individuals of unauthorized access to their sensitive customer information.

176. Vanguard's violations of Section 5 of the FTC Act, the GLBA, and Regulation S-P constitute negligence per se. Plaintiff and Class Members are within the class of persons that these statutes and regulations were intended to protect, and the harms they have suffered as a result of the Data Breach are the types of harm these statutes and regulations were intended to guard against.

177. In the alternative, Vanguard's violations of Section 5 of the FTC Act, the GLBA, and Regulation S-P are evidence of Vanguard's failure to exercise reasonable care in safeguarding Plaintiff's and Class Members' Private Information.

178. Vanguard breached its duties, and thus was negligent, by failing to use reasonable measures to protect Class Members' Private Information. The specific negligent acts and omissions committed by Vanguard include, but are not limited to, the following:

(a) Failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' Private Information;

(b) Failing to adequately monitor the security of their networks and systems;

(c) Failing to ensure that its systems had plans in place to maintain reasonable data security safeguards;

(d) Failing to have in place mitigation policies and procedures;

(e) Allowing unauthorized access to Class Members' Private Information;

(f) Failing to detect in a timely manner that Class Members' Private Information had been compromised; and

(g) Failing to timely notify Class Members about the Data Breach so that they could take appropriate steps to mitigate the potential for identity theft and other damages.

179. It was foreseeable that Vanguard's failure to use reasonable measures to protect Class Members' Private Information would result in injury to Class Members. Furthermore, the Data Breach was reasonably foreseeable given the known high frequency of cyberattacks and data breaches.

180. Vanguard's conduct was grossly negligent and departed from reasonable standards of care, including but not limited to, failing to adequately protect the Private Information and failing to provide Plaintiff and Class Members with timely notice that their sensitive Private Information had been compromised.

181. Neither Plaintiff nor Class Members contributed to the Data Breach and subsequent misuse of their Private Information as described in this Complaint.

182. As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members suffered damages as alleged above.

183. Plaintiff and Class Members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

184. Plaintiff and Class Members are also entitled to injunctive relief requiring Vanguard to, e.g., (i) strengthen their data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) provide adequate credit monitoring to all Class Members.

**COUNT II**
**BREACH OF IMPLIED CONTRACT**
**(On Behalf of Plaintiff and the Class)**

185. Plaintiff re-alleges and incorporates by reference each and every allegation set forth in the above paragraphs as though fully set forth herein.

186. Plaintiff and the Class Members entered into implied contracts with Vanguard under which Vanguard agreed to safeguard and protect such information and to timely and accurately notify Plaintiff and Class Members that their information had been breached and compromised.

187. Plaintiff and the Class were required to and did deliver their Private Information to Vanguard as part of the process of opening accounts and obtaining financial services from Vanguard. Plaintiff and Class Members paid Vanguard fees, expenses, and other charges for financial services with the understanding that this Private Information would be safeguarded by Vanguard.

188. Vanguard solicited, offered, and invited Class Members to provide their Private Information as part of Vanguard's regular business practices. Plaintiff and Class Members accepted Vanguard's offers and provided their Private Information to Vanguard.

189. Vanguard accepted possession of Plaintiff's and Class Members' Private Information for the purpose of providing financial services to Plaintiff and Class Members.

190. In accepting such information and payment for services, Vanguard entered into an implied contract with Plaintiff and the other Class Members whereby Vanguard became obligated to reasonably safeguard Plaintiff's and the other Class Members' Private Information.

191. Upon information and belief, in its written policies, Vanguard expressly and impliedly promised to Plaintiff and Class Members that they would only disclose protected information and other Private Information under certain circumstances, none of which related to a Data Breach as occurred in this matter.

192. The implied promise of confidentiality includes consideration beyond those pre-existing general duties owed under the FTC Act or other state of federal regulations. The additional consideration included implied promises to take adequate steps to comply with specific industry data security standards and FTC guidelines on data security.

193. The implied promises include but are not limited to: (1) taking steps to ensure that any agents who are granted access to Private Information also protect the confidentiality of that data; (2) taking steps to ensure that the information that is placed in the control of its agents is restricted and limited to achieve an authorized purpose; (3) restricting access to qualified and trained agents; (4) designing and implementing appropriate retention policies to protect the information against criminal data breaches; (5) applying or requiring proper encryption; (6) implementing multifactor authentication for access; and (7) taking other steps to protect against foreseeable data breaches.

194. Plaintiff and the Class Members would not have entrusted their Private Information to Vanguard in the absence of such an implied contract.

195. Had Vanguard disclosed to Plaintiff and the Class that it did not have adequate computer systems and security practices to secure sensitive data, Plaintiff and the other Class Members would not have provided their sensitive Private Information to Vanguard.

196. Vanguard recognized that Plaintiff's and Class Members' Private Information is highly sensitive and must be protected, and that this protection was of material importance as part of the bargain to Plaintiff and the other Class Members.

197. Plaintiff and the other Class Members fully performed their obligations under the implied contracts with Vanguard.

198. Vanguard breached the implied contract with Plaintiff and the other Class Members by failing to take reasonable measures to safeguard their Private Information as described herein.

199. As a direct and proximate result of Vanguard's conduct, Plaintiff and the other Class Members suffered and will continue to suffer damages in an amount to be proven at trial.

**COUNT III**
**UNJUST ENRICHMENT**
**(On Behalf of Plaintiff and the Class)**

200. Plaintiff re-alleges and incorporates by reference each and every allegation set forth in the above paragraphs as though fully set forth herein.

201. This count is pleaded in the alternative to Count II (breach of implied contract).

202. Upon information and belief, Vanguard funds its data security measures entirely from its general revenue, including payments made by Plaintiff and the Class Members.

203. As such, a portion of the payments made by Plaintiff and the Class Members is to be used to provide a reasonable level of data security, and the amount of the portion of each payment made that is allocated to data security is known to Vanguard.

204. Plaintiff and Class Members conferred a monetary benefit on Vanguard. Specifically, they purchased financial services from Vanguard, including by paying fund expenses and other charges, and in so doing provided Vanguard with their Private Information. In exchange, Plaintiff and Class Members should have received from Vanguard the services that were the subject of the transaction and have their Private Information protected with adequate data security.

205. Vanguard knew that Plaintiff and Class Members conferred a benefit which Vanguard accepted. Vanguard profited from these transactions and used the Private Information of Plaintiff and Class Members for business purposes.

206. Plaintiff and Class Members conferred a monetary benefit on Vanguard, by paying Vanguard as part of rendering services, a portion of which was to have been used for data security measures to secure Plaintiff's and Class Members' Private Information, and by providing Vanguard with their valuable Private Information.

207. Vanguard was enriched by saving the costs it reasonably should have expended on data security measures to secure Plaintiff's and Class Members' Private Information. Instead of providing a reasonable level of security that would have prevented the Data Breach, Vanguard compromised the Private Information entrusted to it at the expense of Plaintiff and Class Members by utilizing cheaper, ineffective security measures. Plaintiff and Class Members, on the other hand, suffered as a direct and proximate result of Vanguard's failure to provide the requisite security.

208. Under the principles of equity and good conscience, Vanguard should not be permitted to retain the money belonging to Plaintiff and Class Members, because Vanguard failed to implement appropriate data management and security measures that are mandated by industry standards.

209. Vanguard acquired the monetary benefit and Private Information through inequitable means in that it failed to disclose the inadequate security practices previously alleged.

210. If Plaintiff and Class Members knew that Vanguard had not secured their Private Information, they would not have agreed to provide their Private Information to Vanguard.

211. Plaintiff and Class Members have no adequate remedy at law.

212. As a direct and proximate result of Vanguard's conduct, Plaintiff and Class Members have suffered and will suffer injury, including but not limited to: (i) actual identity theft; (ii) the loss of the opportunity to control how their PII is used; (iii) the compromise, publication, and/or theft of their Private Information; (iv) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, and/or unauthorized use of their Private Information; (v) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (vi) the continued risk to their Private Information, which remains in Vanguard's possession and is subject to further unauthorized disclosures so long as Vanguard fails to undertake appropriate and adequate measures to protect Private Information in their continued possession; and (vii) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the Private Information compromised as a result of the Data Breach for the remainder of the lives of Plaintiff and Class Members.

213. As a direct and proximate result of Vanguard's conduct, Plaintiff and Class Members have suffered and will continue to suffer other forms of injury and/or harm.

214. Vanguard should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiff and Class Members, proceeds that they unjustly received from

them. In the alternative, Vanguard should be compelled to refund the amounts that Plaintiff and Class Members overpaid for Vanguard's services.

**COUNT IV**
**VIOLATION OF THE PENNSYLVANIA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW, 73 P.S. § 201-1, ET SEQ.**
**(On Behalf of Plaintiff and the Pennsylvania Subclass or, Alternatively, the Nationwide Class)**

215. Plaintiff re-alleges and incorporates by reference each and every allegation set forth in the above paragraphs as though fully set forth herein.

216. Plaintiff brings this claim individually and on behalf of the Pennsylvania Subclass or, in the alternative, the Nationwide Class.

217. Plaintiff and Subclass Members are "persons" within the meaning of 73 P.S. § 201-2(2) who purchased services from Vanguard primarily for personal, family, or household purposes within the meaning of 73 P.S. § 201-9.2(a).

218. Vanguard is a "person" within the meaning of 73 P.S. § 201-2(2), and its offering of investment, brokerage, retirement, and advisory services constitutes "trade" and "commerce" within the meaning of 73 P.S. § 201-2(3).

219. Vanguard engaged in unfair methods of competition and unfair or deceptive acts or practices declared unlawful by 73 P.S. § 201-3, including by: (a) representing that its services have characteristics or benefits that they do not have, 73 P.S. § 201-2(4)(v); (b) representing that its services are of a particular standard or quality when they are of another, 73 P.S. § 201-2(4)(vii); and (c) engaging in other fraudulent or deceptive conduct that creates a likelihood of confusion or of misunderstanding, 73 P.S. § 201-2(4)(xxi).

220. Among other things, Vanguard represented to its clients that "[t]o protect your personal information from unauthorized access and use, we use security measures that comply

with federal law," and that it maintains "physical, electronic, and procedural safeguards in keeping with industry standards and practices," when, in fact, it did not maintain reasonable and adequate data security. Vanguard also failed to disclose the material fact that its data security practices were inadequate to protect clients' Private Information.

221. Vanguard's representations and omissions were material, and Plaintiff and Subclass Members justifiably relied on them in opening and maintaining accounts with Vanguard, paying for its services, and providing their Private Information to Vanguard.

222. As a direct and proximate result of Vanguard's unlawful conduct, Plaintiff and Subclass Members suffered ascertainable losses of money or property, including fees paid for services of diminished value, out-of-pocket costs incurred to mitigate the effects of the Data Breach, and the diminished value of their Private Information.

223. Pursuant to 73 P.S. § 201-9.2(a), Plaintiff and Subclass Members are entitled to recover their actual damages or $100, whichever is greater, treble damages in the Court's discretion, reasonable attorneys' fees and costs, and such additional relief as the Court deems necessary or proper.

**COUNT V**
**DECLARATORY JUDGMENT**
**(On Behalf of Plaintiff and the Class)**

224. Plaintiff re-alleges and incorporates by reference each and every allegation set forth in the above paragraphs as though fully set forth herein.

225. Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq.*, this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and granting further necessary relief. Furthermore, the Court has broad authority to restrain acts, such as here, that are tortious and violate the terms of the federal and state statutes described in this Complaint.

226. An actual controversy has arisen in the wake of the Data Breach regarding Vanguard's present and prospective common law and other duties to reasonably safeguard Plaintiff's and Class Members' Private Information, and whether Vanguard is currently maintaining data security measures adequate to protect Plaintiff and Class Members from future data breaches that compromise their Private Information. Plaintiff and the Class remain at imminent risk that additional compromises of their Private Information will occur in the future.

227. Pursuant to its authority under the Declaratory Judgment Act, the Court should issue prospective injunctive relief requiring Vanguard to employ adequate security practices consistent with law and industry standards to protect its clients' PII.

228. Vanguard still possesses the Private Information of Plaintiff and the Class.

229. Vanguard has made no announcement that it has changed its data storage or security practices relating to the storage of Plaintiff's and Class Members' Private Information.

230. To Plaintiff's knowledge, Vanguard has made no announcement or notification that it has remedied the vulnerabilities and negligent data security practices that led to the Data Breach.

231. If an injunction is not issued, Plaintiff and the Class will suffer irreparable injury and lack an adequate legal remedy in the event of another data breach at Vanguard. The risk of another such breach is real, immediate, and substantial.

232. The hardship to Plaintiff and Class Members if an injunction does not issue exceeds the hardship to Vanguard if an injunction is issued. Among other things, if another data breach occurs at Vanguard, Plaintiff and Class Members will likely continue to be subjected to a heightened, substantial, imminent risk of fraud, identity theft, and other harms described herein. On the other hand, the cost to Vanguard of complying with an injunction by employing reasonable

prospective data security measures is relatively minimal, and Vanguard has a pre-existing legal obligation to employ such measures.

233. Issuance of the requested injunction will not disserve the public interest. To the contrary, such an injunction would benefit the public by preventing another data breach at Vanguard, thus eliminating the additional injuries that would result to Plaintiff and Class Members, along with other clients whose Private Information would be further compromised.

234. Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring that Vanguard implement and maintain reasonable security measures, including but not limited to the following:

a. Engaging third-party security auditors/penetration testers, as well as internal security personnel, to conduct testing that includes simulated attacks, penetration tests, and audits on Vanguard's systems on a periodic basis, and ordering Vanguard to promptly correct any problems or issues detected by such third-party security auditors;

b. Engaging third-party security auditors and internal personnel to run automated security monitoring;

c. Auditing, testing, and training its security personnel regarding any new or modified procedures;

d. Purging, deleting, and destroying Private Information not necessary for Vanguard's provisions of services in a reasonably secure manner;

e. Conducting regular database scans and security checks; and

f. Routinely and continually conducting internal training and education to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, individually and on behalf of all others similarly situated, seeks judgment against Defendant, as follows:

(a) For an Order certifying this action as a Class action and appointing Plaintiff as Class Representative and his counsel as Class Counsel;

(b) For equitable relief enjoining Vanguard from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiff's and Class Members' Private Information, and from refusing to issue prompt, complete and accurate disclosures to Plaintiff and Class Members;

(c) For equitable relief compelling Vanguard to utilize appropriate methods and policies with respect to consumer data collection, storage, and safety, and to disclose with specificity the type of Private Information compromised during the Data Breach;

(d) For equitable relief requiring restitution and disgorgement of the revenues wrongfully retained as a result of Vanguard's wrongful conduct;

(e) Ordering Vanguard to pay for not less than ten years of credit monitoring services for Plaintiff and the Class;

(f) For an award of actual damages, compensatory damages, punitive damages, statutory damages, and statutory penalties, in an amount to be determined, as allowable by law;

(g) For an award of costs and any other expense, including expert witness fees;

(h) Post-judgment interest on any amounts awarded; and

(i) Such other and further relief as this court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiff demands a trial by jury of all claims in this Complaint so triable.

Dated: November 10, 2026

Respectfully submitted,

**SHUB JOHNS & HOLBROOK LLP**
Benjamin F. Johns (PA Bar No. 201373)
Samantha E. Holbrook (PA Bar No. 311829)
Deirdre R. Mulligan (PA Bar No. 331264)
Four Tower Bridge
200 Barr Harbor Drive, Suite 400
Conshohocken, PA 19428
T: (610) 477-8380
bjohns@shublawyers.com
sholbrook@shublawyers.com
dmulligan@shublawyers.com

*Attorneys for Plaintiff and the Proposed Class*